## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

MARK SELLEY,

        Plaintiff,
                                CASE NO: 17-cv-12834
                                HON. THOMAS L. LUDINGTON

v.

MIDLAND COUNTY, LORREN HURREN,
AND OTHER UNKNOWN DEFENDANTS, in their individual and official
capacities,

        Defendants.

| | |
|---|---|
| CHRISTOPHER TRAINOR & ASSOCIATES<br>CHRISTOPHER J. TRAINOR (P42449)<br>AMY J. DEROUIN (P70514)<br>Attorneys for Plaintiff<br>9750 Highland Road<br>White Lake, MI  48386<br>(248) 886-8650 / (248) 698-3321-fax<br>Amy.derouin@cjtrainor.com | JOHNSON, ROSATI, SCHULTZ &<br>JOPPICH, P.C.<br>ANDREW J. BREGE (P71474)<br>Attorney for Defendants<br>822 Centennial Way, Ste. 270<br>Lansing, MI 48917<br>(517) 886-3800 / (517) 886-9154-fax<br>abrege@jrsjlaw.com |

## **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    **NOW COMES** Plaintiff, **MARK SELLEY**, by and through his attorneys,

CHRISTOPHER TRAINOR & ASSOCIATES, and for his *Response to Defendants'*

*Motion for Summary Judgment* states the following:

    Plaintiff hereby denies each and every allegation contained in Defendants'

Motion for the reasons stated in the accompanying brief and leaves Defendants to

their strict proofs.

**WHEREFORE**, in light of the arguments, case law, and underlying evidence presented herein, Plaintiff respectfully requests that this Honorable Court deny Defendants' Motion in its entirety.

Respectfully Submitted,
CHRISTOPHER TRAINOR & ASSOCIATES
/s/Amy J. DeRouin
CHRISTOPHER J. TRAINOR (P42449)
AMY J. DEROUIN (P70514)
Attorneys for Plaintiff
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
amy.derouin@cjtrainor.com

Dated: December 14, 2018
*CJT/ajd*

**CERTIFICATE OF SERVICE**
I hereby certify that on December 17, 2018, I electronically filed the
foregoing paper with the Clerk of the Court using the ECF system
which will send notification of such filing to the following: ***all attorneys of record***
and I hereby certify that I have mailed by United States Postal Service the
paper to the following non-ECF participants: ***None.***
/s/ Amy J. DeRouin
Christopher Trainor & Associates
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
amy.derouin@cjtrainor.co

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

MARK SELLEY,

      Plaintiff,
                        CASE NO: 17-cv-12834
                        HON. THOMAS L. LUDINGTON

v.

MIDLAND COUNTY, LORREN HURREN,
AND OTHER UNKNOWN DEFENDANTS, in their individual and official capacities,

      Defendants.

| | |
|---|---|
| CHRISTOPHER TRAINOR & ASSOCIATES<br>CHRISTOPHER J. TRAINOR (P42449)<br>AMY J. DEROUIN (P70514)<br>Attorneys for Plaintiff<br>9750 Highland Road<br>White Lake, MI  48386<br>(248) 886-8650 / (248) 698-3321-fax<br>Amy.derouin@cjtrainor.com | JOHNSON, ROSATI, SCHULTZ &<br>JOPPICH, P.C.<br>ANDREW J. BREGE (P71474)<br>Attorney for Defendants<br>822 Centennial Way, Ste. 270<br>Lansing, MI 48917<br>(517) 886-3800 / (517) 886-9154-fax<br>abrege@jrsjlaw.com |

## <u>BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS'</u>
## <u>MOTION FOR SUMMARY JUDGMENT</u>

# **TABLE OF CONTENTS**

Questions Presented…………………………………………………………..…iii

Index of Authorities…………………………………………………………..….iv

Most Controlling Authority…………………………………………………....…v

Statement of Facts……………………………………………………………......1

Corroborating Facts……………………………………………………….....…9

Legal Argument……………………………………………………....……..…11

   A. Standard of Review…………………………………………………..…..11

   B. Defendant is Not Entitled to Qualified
      Immunity Because He Violated Mr. Selley's
      Clearly Established Fourteenth Amendment Rights………………….…….12

   C. Plaintiff Has a Viable *Monell* Claim
      Against County of Midland…………….…………………………..…..21

   D. Plaintiff's Claim of Gross Negligence is Not Time-Barred………………….23

   E. Plaintiff Has a Viable Gross Negligence Claim……………………………23

Conclusion…………………………………………….……………………..25

## QUESTIONS PRESENTED

I.   **WHETHER DEFENDANT HURREN IS ENTITLED TO QUALIFIED IMMUNITY WHEN HE VIOLATED MR. SELLEY'S CLEARLY ESTABLISHED FOURTEENTH AMENDMENT RIGHTS WHEN HE WAS DELIBERATELY INDIFFERENT TO HIS SAFETY?**

Plaintiff says: No.
Defendants say: Yes.

II.  **WHETHER MR. SELLEY ESTABLISHED A VIABLE *MONELL* CLAIM AGAINST DEFENDANT MIDLAND COUNTY?**

Plaintiff says: Yes.
Defendants say: No.

III. **WHETHER MR. SELLEY'S GROSS NEGLIGENCE CLAIM IS TIME-BARRED?**

Plaintiff says: No.
Defendants say: Yes.

IV.  **WHETHER DEFENDANT HURREN IS ENTITLED TO GOVERNMENTAL IMMUNITY WHEN HE ACTED IN A GROSSLY NEGLIGENT MANNER WHICH WAS "THE" PROXIMATE CAUSE OF MR. SELLEY'S INJURIES?**

Plaintiff says: No.
Defendants say: Yes.

# INDEX OF AUTHORITIES

## Cases

*Amick v. Ohio Dep't of Rehab. & Corr.*, 521 Fed. Appx. 354 (6th Cir. 2013).......17

*Bishop v. Hackell*, 636 F.3d 757 (6th Cir. 2011).....................................................17

*Brown v. Shaner*, 172 F.3d 927 (6th Cir. 1999).....................................................24

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)........................................................13

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).......................................23, 24

*City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239 (1983)......................................16

*Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001)..............................................18

*Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556 (1st Cir. 1988)..................16

*Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690 (6th Cir. 2006)..........................24

*Everson v. Leis*, 556 F.3d 484 (6th Cir. 2009).......................................................15

*Farmer v. Brennan*, 511 U.S. 825 (1994)...................................................16, 17, 18

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)...........................................................14

*Hope v. Pelzer*, 536 U.S. 730 (2002)......................................................................14

*Jackson v. Saginaw County*, 458 Mich. 141; 580 N.W.2d 870 (1998)..................26

*Johnson v. Jones*, 515 U.S. 304 (1995)..................................................................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).............13

*Miller v. Calhoun County*, 408 F.3d 803 (6th Cir. 2005)......................................18

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)..............................................23

*Newman v. Holmes*, 122 F.3d 650 (8th Cir. 1997)............................................20, 21

*Pearson v. Callahan*, 555 U.S. 223 (2009)................................................................15

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)..............................................23

*People v. McCoy*, 223 Mich. App. 500 (1997)........................................................26

*Perez v. Oakland County*, 466 F.3d 416 (6th Cir. 2006)..................................17, 18

*Phillips v. Roane County*, 534 F.3d 531 (6th Cir. 2008)..................................15, 16

*Pifer v. Ruegsegger*, 1996 U.S. Dist. LEXIS 18444*......................................20, 21

*Saucier v. Katz*, 533 U.S. 194, (2001)....................................................................14

*Searcy v. County of Oakland*, 735 F.Supp.2d 759 (E.D. Mich. 2010)...................25

*Stanton v. City of Battle Creek*, 237 Mich. App. 366 (1999)..................................26

*Street v. Corrections Corp. of Am.*, 102 F.3d 810 (6th Cir. 1996)..............18, 19, 20

*Tarlea v. Crabtree*, 263 Mich. App. 80 (2004)......................................................26

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014)...........................................................14, 15

## <u>Rules</u>

Fed. Rule Civ. Pro. 56......................................................................................12, 13

## <u>Statutes</u>

M.C.L. §600.5805(2)................................................................................................25

M.C.L. §691.1407(8)(a).............................................................................................25

## MOST CONTROLLING AUTHORITY

*Farmer v. Brennan*, 511 U.S. 825 (1994)

*Street v. Corrections Corp. of Am.*, 102 F.3d 810 (6th Cir. 1996)

## I.   **STATEMENT OF FACTS:**

On February 22, 2015, Mr. Selley was lodged in the Midland County Jail ("MCJ") as a pretrial detainee. **(Exhibit A; Exhibit B, Selley, p. 66).** Mr. Selley was ultimately assigned to the cell E207A on the second floor of the E-Pod (a medium security unit with two floors where only one deputy is assigned at a time). **(Ex. A; Ex. B, pp. 69-70; Exhibit C, Hurren, p. 14).** Notably, only one floor of E-Pod inmates were allowed out of their cells at a time while the other floor remained on lockdown for security purposes. **(Ex. B, pp. 69-70).** By comparison, the D-Pod (a lower security unit) allows both floors to intermingle, and F-Pod (a maximum security unit) requires that only one inmate be released from his cell at a time and only for one hour per day. **(Ex. B, p. 99; Ex. C, p. 14).**

Beginning on August 10, 2015, Mr. Selley shared his cell with inmate Kuch, who was transferred pursuant to a separation order against inmate Townsend, who was inexplicably let out of maximum security. **(Ex. B, pp. 71-72, 74, 79, 87; Exhibit D, Kuch, p. 8; Exhibit E).** At such time, Townsend was newly housed on the first floor of E-Pod after spending most of his time in F-Pod due to his violent and aggressive behavior against staff and inmates at MCJ. Specifically, Townsend was in F-Pod (disciplinary segregation), or an equivalent maximum security intake cell, from March 26, 2015 to July 28, 2015. **(Exhibit F; Exhibit G, Keidel, pp. 6-8).**

On August 19, 2015, Defendant Hurren—the only officer assigned to E-Pod—knowingly opened all cell doors on the upper floor. **(Ex. B, pp. 83-85; Ex. D, p. 29).** As Mr. Selley rightfully exited his cell to retrieve a cleaning mop, he noticed from his standpoint on the second floor that some of the cell doors on the lower floor were also opened, and Defendant Hurren continued to open more doors on the first floor. **(Ex. B, pp. 83-84; Exhibit H, Video, 22:30).** When Mr. Selley returned to clean his cell, he found Townsend inside his cell threatening and preparing to attack Kuch. **(Ex. B, pp. 82-83, 88-90).** Mr. Selley attempted to guide Townsend, without touching him, out of the cell with the handle of his mop. **(Ex. B, pp. 91-93).** Townsend struck Mr. Selley in the back of the head, knocking him out; when Mr. Selley regained consciousness, Townsend was on top of him, beating him, and there was blood everywhere while Townsend's buddy, inmate Kimble, stood watch. **(Ex. B, pp. 93-94, 126-127; Ex. D, pp. 29-30; Exhibit I, Speich, pp. 54-55).** Dazed and confused, Mr. Selley managed to crawl out of the cell and an ambulance was called. **(Ex. B, pp. 94-95).** Mr. Selley was transported to the hospital and initially diagnosed with a broken nose, a concussion, an orbital bone injury, and damage to his teeth. **(Ex. B, p. 102).**

### A. TOWNSEND'S VIOLENT HISTORY AT MCJ

Townsend was booked into MCJ on February 26, 2015, on charges of resisting an officer, aggravated felonious assault or mayhem, and aggravated felonious assault of a police officer. **(Exhibit J).** Moreover, Deputy Pfund testified that Townsend

was being held as a federal inmate and it was known that he pled guilty to armed carjacking in 2013. **(Exhibit K, Pfund, pp. 12-13).** Furthermore, Townsend had a known history of violence toward officers and other inmates at MCJ, which included approximately 17 documented major rules violations prior to his assault on Mr. Selley as referenced below.

On March 26, 2015, inmate Karas told Townsend to stop grabbing his cell door to which Townsend responded, "Fuck you bitch. Just wait until the doors pop." **(Exhibit L).** Townsend made good on his threat and, when the doors unlocked, **he entered Karas' cell and punched him in the face. (Ex. L).** Multiple corrections' officers responded to the assault. **(Ex. L).** As Deputy Seer and Deputy Furst escorted Townsend to Intake, Townsend turned around **and punched Deputy Seer in the face twice. (Exhibit M; Ex. I; p. 20; Exhibit N, Kryzanowicz, p. 29; Exhibit O, Dull, pp. 13-16).** Four days later on March 30, 2015, Townsend **punched Deputy Kryzanowicz in the face and stomach causing him to receive medical treatment. (Exhibit P; Ex. N, p. 10).** The next day, two deputies from Sanilac County (where Townsend was previously incarcerated) were dropping off an inmate when Townsend told them "Midland is going to kill me or it will be the other way around." **(Ex. Q).** The Sanilac deputies warned MCJ Deputy Furst that Townsend was **"nothing but issues while he was incarcerated at the Sanilac County Jail." (Ex. Q; Ex. K, pp. 9, 12).** Deputy Furst recommended that

Townsend be housed in maximum security F-Pod for the duration of his stay at MCJ for **continuing to threaten jail staff**.  **(Ex. Q).**

On May 14, 2015, Townsend was sentenced to 30 days of disciplinary segregation (held in abeyance) for **disrupting jail security** while housed in F-Pod. **(Exhibit R).**  Only days later on May 17, 2015, Townsend was housed in an intake holding cell on suicide watch when he threatened to destroy his cell by knocking out the camera and breaking the sprinkler.  **(Exhibit S).**  Multiple correction's officers, **including Defendant Hurren**, were forced to strap Townsend into a restraint chair. **(Ex. S).**  Townsend was sentenced to an additional 30 days of disciplinary segregation (held in abeyance).  **(Ex. S).**

On June 11, 2015, Townsend was **about to start a fight with another inmate** when Shift Leader Speich and Deputy Keidel entered F-Pod with their tasers drawn. **(Exhibit T).**  Townsend was handcuffed and, while being escorted out of F-Pod, kicked the doors and **threatened to "beat the officers' asses"** if they ever entered his cell without their tasers or badges.  **(Ex. T).**  Shift Leader Speich testified that it took six deputies to remove Townsend from F-Pod and transfer him to Intake. **(Ex. I, pp. 51-52, 55-56; Exhibit U, Derocher, p. 79).**  Townsend was sentenced to an additional 30 days disciplinary segregation (consecutive).  **(Ex. T).**  On June 17, 2015, Townsend was sentenced to an additional 45 days of disciplinary segregation (consecutive) for **disrupting jail security** while in F-Pod.  **(Exhibit V).**

June 24, 2015 was a particularly unruly day for Townsend, who had to be placed in a restraint chair after calling Deputy Keidel a "bitch" and threatening to "slap this shit out of him," throwing a plastic chair up to the second floor of F-Pod, and kicking a door until its glass broke. **(Exhibit W)**. **Three days later on June 27, 2015, Defendant Hurren reported that "[f]or the safety and security of the staff, jail, and Townsend himself, it was determined based on his assaultive and destructive past behavior that he be handcuffed and escorted to D-1 in Intake," which is an overflow maximum security cell.** **(Exhibit X; Ex. C, pp. 17-18)**. Then, for some unknown reason, Townsend was transferred to E-Pod on July 28, 2015. **(Ex. F)**. Not one MCJ employee deposed could explain as to why Townsend was transferred to E-Pod and stated that this was a question for Captain Harnois and Lieutenant Derocher. **(Ex. C, pp. 20-21; Ex. N, pp. 9-10; Exhibit Y, Manary, pp. 26, 33)**. Notably, Lieutenant Derocher was asked this very question and testified that he has no explanation or any good reason as to why Townsend was transferred to E-Pod when he was ordered to be on disciplinary segregation until October 10, 2015. **(Ex. U, pp. 31-32; Ex. C, p. 28)**.

On August 10, 2015, and while in E-Pod, Townsend pled guilty to **stealing Kuch's ramen noodles** and was sentenced to seven (7) days loss of privilege. **(Exhibit Z)**. On August 17, 2015 – only two (2) days before Townsend attacked Mr. Selley—Townsend was **caught on the upper tier of E-Pod on two (2)**

**different occasions** despite being verbally warned the week before and "clearly understanding" that he was not supposed to be upstairs. **(Exhibit AA).** Remarkably, Townsend was not disciplined for this offense and remained in E-Pod, even though it should have been a major rule violation, which would have transferred him back to F-Pod (disciplinary segregation). **(Ex. AA; Ex. Y, pp. 41-43, 45-47).**

### B. TOWNSEND'S PRIOR KNOWN THREATS TO MR. SELLEY AND KUCH

Townsend had a known history of threatening and bullying both Mr. Selley and Kuch before the subject incident. The first time Kuch had an issue with Townsend occurred on August 10, 2015, when Townsend entered his cell without permission and stole his ramen noodles. **(Ex. D, pp. 11-13; Ex. Z). Kuch reported the theft to correction's officers**, but Townsend was not transferred from E-Pod. **(Ex. D, pp. 15-20; Ex. O, 35-36).** As a result, **Townsend repeatedly threatened to kill Kuch and his family to the extent that Kuch obtained a separation order and was transferred to Mr. Selley's cell on the second floor of E-Pod**. **(Ex. B, pp. 71-72, 74, 79; Ex. D, pp. 15-20).** Immediately after Kuch was transferred to Mr. Selley's cell, **Townsend began making daily visits outside their cell to threaten them**. **(Ex. B, pp. 80, 91, 137, 144; Ex. D, pp. 21, 49).** Notably, Townsend was often told by the guards over the intercom that he was not allowed on the second floor and ordered to return to the first floor. **(Ex. D, pp. 20-21, 34).** On at least one occasion, Mr. Selley told Townsend to leave them alone and, in response, Townsend began threatening to kill Mr. Selley. **(Ex. D, p. 21). Both Mr.**

**Selley and Kuch reported these threats to correction's officers on multiple occasions**; however, nothing was done to protect either of them. **(Ex D, pp. 18, 22-23, 25, 27, 37-38).** Notably, Kuch witnessed Mr. Selley complete a written grievance regarding Townsend's threatening behavior toward Mr. Selley which, despite Plaintiff's written discovery request for production of said document, Defendants have failed to produce same. **(Ex. D, p. 27; Exhibit EE, #2, p. 2).**

### C. DEFENDANT HURREN'S UNLAWFUL ACTS

Defendant Hurren, who controlled the opening and closing of the cell doors, admitted that both E-Pod floors were not allowed to be released into population at the same time because E-Pod is a higher security unit. **(Ex. C, pp. 18-20).** Prior to the subject incident, Defendant Hurren was well aware of Townsend's violent behavior, and had identified Townsend before the subject incident as a management problem and a danger to officers and inmates. **(Ex. C, pp. 21, 38; Ex. X).** Despite all of this, Defendant Hurren opened Townsend's cell to allegedly retrieve his laundry while knowing the entire second floor was unlocked allowing for Townsend to exit his cell to beat Mr. Selley. **(Ex. C, pp. 47-49; Ex. H).**

Specifically, the surveillance video depicts Defendant Hurren disappearing from the camera's view **to open Townsend's cell at 18:20:07. (Ex. H).** Defendant Hurren returns to full view at 18:20:25. **(Ex. H).** At 18:20:37, Defendant Hurren walks across the entire lower floor to the other side of the pod **with his back toward Townsend's unlocked cell the entire time. (Ex. H).** At 18:21:00, Defendant

Hurren appears to dawdle in the middle of the pod before slowly walking the hall of cells perpendicular to Townsend's cell. **(Ex. H).** Defendant Hurren again makes his way back toward the middle of the pod **with his back toward Townsend's unlocked cell the whole time**. **(Ex. H).** Townsend appears on screen for the first time at 18:22:29—**over two minutes after Defendant Hurren opened his cell**. Defendant Hurren begins to walk back toward Townsend's cell at 18:22:29. **(Ex. H).** Townsend disappears at 18:22:40 when Defendant Hurren appears to be approaching him; however, Defendant Hurren then walks directly to the corner of the pod with his back toward Townsend. **(Ex. H).** Townsend appears on screen at 18:22:45 and walks straight upstairs to assault Kuch and Selley. **(Ex. H).**

Notably, Defendant Hurren's fellow corrections' officers did not agree with his actions. Specifically, Deputy Manary testified that he would stand next to a cell and watch whenever he opened an inmate's door, and he never would have left Townsend's door open. **(Ex. Y, pp. 20, 37).** Likewise, Deputy Dull testified that he was trained not to leave an inmate's door open and unlocked after exchanging laundry with the inmate. **(Ex. O, p. 26).** Additionally, Lieutenant Derocher testified that when the laundry was exchanged, the cell door should have been shut and locked. **(Ex. U, pp. 123-124, 126).** When asked after the incident by another guard why he opened cells on both the first and second floor, Defendant Hurren simply

stated, "I was by myself, what did you expect me to do?"  **(Ex. B, pp. 82, 140-141,**

**150).**

II.   **CORROBORATING FACTS:**

   A.   **DEPOSITION TESTIMONY OF MR. SELLEY (EXHIBIT B):**
- A correction's officer told him Kuch moved to the second floor because **he had a separation order from Townsend**.  **(pp. 74, 141-42, 144).**
- As soon as Kuch moved to his cell, Townsend began harassing.  **(p. 144).**
- Townsend had fought with officers before **which was common knowledge to the officers**.  **(pp. 96-97).**

   B.   **DEPOSITION TESTIMONY OF BRIAN KUCH (EXHIBIT D):**
- After he moved to Selley's cell, Townsend came up to the second floor **almost every day** and threaten him and his family. **(pp. 21, 27, 34, 49).**
- Townsend was often, but not always, told by the guards over the intercom to return to the first floor.  **(pp. 20-21, 27, 34).**
- He **reported these threats to several correction's officers** and nothing was done **(pp. 17-18, 23, 25-27).**
- **Selley wrote a grievance** about Townsend threatening them, and Selley told him he reported the threats to Officer White.  **(pp. 23, 25, 27, 37-38).**

   C.   **DEPOSITION TESTIMONY OF DEFENDANT HURREN (EXHIBIT C):**
- He acknowledges that both floors in E-Pod cannot come out in population at the same time because the pod is a little higher security.  **(pp. 19-20).**
- He identified Townsend before this incident as a management problem and a danger to officers and inmates.  **(pp. 21, 23, 37).**
- There was no reason for Townsend to be on the second floor of E-Pod as he was housed on the first floor.  **(p. 45).**
- It is an accepted procedure in the Jail to open up more than one cell before he gets to it during laundry exchange even if there is a high-risk inmate. **(p. 66).** *Notably, this fact is disputed by all correction's officers deposed in this matter.* **(Ex. Y, 20, 37; Ex. O, 26; Ex. U, 123-124, 126).**
- Based on the video, he should have told Townsend to get back in his cell instead of walked away with his back toward him.  **(pp. 69-70).**

   D.   **DEPOSITION TESTIMONY OF AMY RANDALL (EXHIBIT BB):**
- Knowledge about an incident with an inmate is passed down from shift-to-shift so the officers have knowledge. **(p. 24).**

- When there is a separation order in place, it is the deputy's responsibility to make sure inmates stay on separate tiers. **(p. 47).**

E. **DEPOSITION TESTIMONY OF BRIAN KRYZANOWICZ (EXHIBIT N):**
- Townsend was a danger to officers and inmates. **(pp. 8-9).**
- **Townsend should have been in F-Pod maximum security segregation the entire time that he was at MCJ.** **(pp. 9-10).**
- Townsend could go off on anyone for any reason at any time. **(pp. 18-19).**
- Officer Kryzanowicz worked E-Pod and confirmed that inmates on both tiers are not supposed to be let out at the same time, even for cleaning purposes and he never did laundry rounds at the same time he was supervising the cleaning. **(p. 25, 28).**

F. **DEPOSITION TESTIMONY OF ROBERT MANARY (EXHIBIT Y):**
- When he did laundry, he would open a couple doors at a time, exchange, and then he would secure their door, and go to the next one. **(pp. 18-20).**
- He would also stand there and watch the person when the door was unlocked. **(p. 20).**
- **He would not have left Townsend's door open at the time of the subject incident.** **(p. 37).**
- Kuch may have complained to other officers about being threatened and of afraid of being beaten. **(p. 43).**

G. **DEPOSITION TESTIMONY OF SEAN DULL (EXHIBIT O):**
- He was trained to take dirty laundry out, give the inmate the clean laundry, shut the door, and make sure the door is locked. **(p. 26).**

H. **DEPOSITION TESTIMONY OF RICHARD SPEICH (EXHIBIT I):**
- While the upper tier is cleaning and unlocked, he did laundry door-to-door on the lower tier and made sure each door was locked so the inmate could not get out when his back was turned. **(pp. 65, 67).**

I. **DEPOSITION TESTIMONY OF JAMIE CHRISTENSEN "PFUND"(EXHIBIT K):**
- When she does laundry on the in E-Pod, she does it one door at a time and makes sure when the door is shut it is locked for safety.**(p. 18).**

J. **DEPOSITION TESTIMONY OF JOSHUA QUALLS (EXHIBIT CC):**
- When he does laundry, he goes door-to-door and would shut the door and make sure it is locked before he walked to the next cell. **(p. 16).**

**K.   DEPOSITION TESTIMONY OF JEFFREY DEROCHER (EXHIBIT U):**
- There was not a day that he was not going to worry about Townsend being a serious risk to harming officers and inmates. **(pp. 11-13).**
- Defendant Hurren was responsible for shutting Townsend's door and should have made sure it was locked after the linen was taken. **(pp. 123-124, 126).**

## III.   LEGAL ARGUMENT:
### A. STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure ("FRCP") 56 is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  In reviewing a motion under FRCP 56, the court is to look beyond the pleadings, considering any depositions, affidavits, and admissions on file to determine whether there is a genuine issue of material fact.  FRCP 56(C)(2).  The party seeking summary judgment bears the initial burden of showing the court that there is an absence of a genuine issue of dispute over any material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Also, under FRCP 56, the court must draw all reasonable inferences from the record in the light most favorable to the nonmoving party and the court may grant summary judgment only where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986).  In light of applicable law and the evidence presented herein, Defendants' Motion for Summary Judgment must be denied in its entirety.

11

## B. DEFENDANT HURREN IS NOT ENTITLED TO QUALIFIED IMMUNITY

Defendant Hurren's actions unquestionably violated Mr. Selley's clearly established Fourteenth Amendment rights as a pre-trial detainee when he was deliberately indifferent to Mr. Selley and failed to take reasonable measures to guarantee Mr. Selley's safety by preventing him from being viciously attacked by a well-known violent inmate, who had repeatedly made prior physical threats to both Mr. Selley and his cellmate which was known by MCJ personnel. Moreover, any reasonable officer in the same position would have taken reasonable measures to guarantee Mr. Selley's safety in preventing this attack by assuring that inmate Townsend remained locked down while the upper tier, including Mr. Selley's cell, was unlocked and permitted into general population. **(Ex. I, pp. 65-67; Ex. K, p. 18; Ex. N, pp. 25, 28; Ex. U, pp. 123-124, 126; Ex. Y, pp. 20, 37; Ex. O, p. 26; Exhibit BB, Randall, p. 47; Exhibit CC, Qualls, p. 16).** Accordingly, Defendant Hurren is not entitled to qualified immunity.

Qualified immunity is a privilege granting immunity to government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a defendant is entitled to qualified immunity at the summary judgment stage, courts are required to engage in a two-pronged inquiry. *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014). The first inquiry asks whether the facts, "[t]aken in the

light most favorable to the party asserting the injury . . . show the officer's conduct violated a [federal right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second prong of the qualified immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* "[T]he salient question . . . is whether the state of law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.* at 741. While the plaintiff has the burden of showing that a right is clearly established, "the defendant carries the burden of showing that the challenged act was objectively reasonable in light of the law existing at the time." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).

Regarding the two qualified immunity prongs mentioned above, courts have discretion to decide the order in which to evaluate those two prongs. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). However, under either prong, **courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment**." *Cotton, supra* at 1866 (emphasis added). In considering whether a constitutional violation occurred, if the defendant challenges the plaintiff's version of the facts, an issue of fact is created, and qualified immunity must be denied. *Johnson v. Jones*, 515 U.S. 304 (1995).

As set forth below, Defendant Hurren violated Mr. Selley's clearly established Fourteenth Amendment rights, and he had notice at the time that his actions against him constituted a deliberate indifference to Mr. Selley's safety in violation of the Fourteenth Amendment.

### 1. Defendant Hurren Violated Mr. Selley's Clearly Established Fourteenth Amendment Rights

Based upon Mr. Selley's pre-trial detainee status at the time of the subject incident, his deliberate indifference claim is properly alleged under the Fourteenth Amendment—however, the deliberate indifference standard pursuant to either the Eighth or Fourteenth Amendment is the same. *Phillips v. Roane County,* 534 F.3d 531 (6th Cir. 2008). Specifically, "[t]he Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a §1983 claim of deliberate indifference to serious medical needs, but where that claim is asserted on behalf of a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point." *Id.* at 539 (6th Cir. 2008) relying upon *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983) "('[T]he due process rights of a [pre-trial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner.')."

It is well established under the Eighth and Fourteenth Amendments that "prison officials have a duty...to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994), citing *Cortes-*

*Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (CA1) (internal quotations marks and citation omitted), cert. denied, 488 U.S. 823 (1988).   As a condition of confinement, having effectively stripped inmates of any means of self-protection from other incarcerated persons with known inclinations toward antisocial criminal and violent behavior, "the government and its officials are not free to let the state of nature take its course" and tolerate beatings among inmates. *Id.* at 833-834.   Thus, while not every inmate injury from other inmates equates to a constitutional violation, inmates do have a right to be free from prison violence and, correspondingly, free from deliberate indifference to attacks between inmates. *Bishop v. Hackell,* 636 F.3d 757, 766 (6th Cir. 2011).

In order for Defendant Hurren to be liable, his actions must be deliberately indifferent to Mr. Selley's safety—requiring the satisfaction of a two prong test. *Farmer, supra.*   With regard to the first prong, "the deprivation alleged must be, objectively, 'sufficiently serious."   *Id.* at 834.   See also P*erez v. Oakland County*, 466 F.3d 416, 423-424 (6th Cir. 2006).   Moreover, this objective component can be satisfied by demonstrating that an inmate has been exposed to a "substantial risk of serious harm."*Amick v. Ohio Dep't of Rehab & Corr.* 521 F. App'x 354, 361 (6th Cir. 2013) citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Mr. Selley was not only exposed to a substantial risk of serious harm when Defendant Hurren released Townsend from his cell—he actually suffered numerous

injuries in the assault. Townsend struck him in the back of the head and Mr. Selley lost consciousness, awakening to blood everywhere in his cell and Townsend continuing to pummel him. Ultimately, Mr. Selley required transportation to the hospital for a broken nose, a concussion, an orbital bone injury, and damage to his teeth. Accordingly, the objective component has been satisfied.

With regard to the second prong, Mr. Selley must demonstrate that Defendant Hurren was deliberately indifferent to Mr. Selley's safety—this subjective component is also satisfied. Specifically and with respect to the subjective component, the Sixth Circuit has emphasized that a plaintiff must produce evidence showing "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Perez* at 424 (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)); See also, *Farmer* at 837. It is possible for a factfinder to conclude that "a prison official knew of a substantial risk from the very fact that the risk is obvious." *Farmer* at 842. While deliberate indifference requires a degree of culpability greater than mere negligence, it does not require that the acts or omissions be accomplished for the very purpose of causing harm or with knowledge that harm will result. *Perez, supra* at 424 (citing *Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005)). Moreover, "[a]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly

disregarding that risk." *Street v. Corrections Corp. of Am.,* 102 F.3d 810 (6th Cir. 1996) quoting *Farmer* at 836.

In their Brief, Defendants rely on an incredibly narrow characterization of Defendant Hurren's actions to assert that he had no reasonable notice that he had placed Mr. Selley at substantial risk of harm by Townsend.  Defendants argue that no case is on point and Mr. Selley never made any complaints about Townsend or told officers about his specific threats.  However, a case factually similar to the instant case in support of the denial of summary judgment is *Street v. Corrections Corp. of Am.,* 102 F.3d 810 (6th Cir. 1996).  In *Street,* the plaintiff argued with a fellow inmate named Harris in which inmate Harris threatened him.  *Id. at* 812.  The plaintiff later made a comment about fighting inmate Harris.  *Id.* At shift change, the defendant guard, who was assigned to the unit in which both the plaintiff and inmate Harris were housed, was informed that the plaintiff and inmate Harris had "gotten into it."  *Id.* Inmate Harris then asked the defendant guard what he would do if he physically assaulted the plaintiff.  *Id.*  The defendant guard subsequently opened all doors to the cells in the housing unit where both the plaintiff and inmate Harris were housed.  *Id.* at 813. Inmate Harris attacked the plaintiff causing significant injuries including, but not limited to, an orbital blowout fracture.  *Id.*  In reversing the district court's granting of summary judgment as to the defendant guard, the Court held that there were fact issues as to whether he was deliberately indifferent to a substantial

17

risk of harm to plaintiff.  In reaching its decision, the Court relied upon, in part, the following facts: the defendant guard was aware of the threat; inmate Harris had discipline problems in which some involved violence; inmate Harris had been put in administrative segregation due to his refusal to obey a corrections officer in association with Harris' threat of violence to another inmate; and inmate Harris was identified as a "severe facility security problem" and as "a threat to the safety of inmates."  *Id.* at 813-14, 816-17.  Importantly, *Street* specifically contradicts Defendant's reliance on the unpublished case of *Mosquera v. Delgado*, 2010 WL 2010973 (N.D. Ohio Apr. 30, 2010), in that the *Street* Court restated that prison officials are liable for constitutional violations when they are deliberately indifferent to either a pervasive risk of harm **generally** or a serious risk of assault to a member of an identifiable group—threats to a specific individual communicated to prison personnel is not a requirement. *Street* at 815-816 (emphasis added).

The cases of *Pifer v. Ruegsegger*, 1996 U.S. Dist. LEXIS 18444* **(Exhibit GG)** and *Newman v. Holmes*, 122 F.3d 650 (8th Cir. 1997), which although are not binding, are factually similar and are persuasive authority in support of the denial of Defendants' instant Motion.  In *Pifer*, the plaintiff was attacked by another prisoner when the defendant control booth officer erroneously opened the plaintiff's cell door. *Pifer, supra* at *2-3.  The hostile inmate—who was proceeding toward his own cell—was directly in front of the plaintiff's cell when the defendant opened

plaintiff's cell door without first confirming whose door he was opening. *Id.* The *Pifer* court, relying on *Farmer*, *supra*, found that, because the subject facility was a maximum security prison with regulations on the movement of dangerous prisoners, the risk of harm was pervasive, and the defendant did not check to be sure the hostile inmate was to be let into the proper cell, the defendant was deliberately indifferent to an excessive risk of harm to the plaintiff. *Id.* at *13-15. Notably, the court reasoned that it was "patently impossible to imagine that Defendant was so ignorant as to be unaware of his work environment and not realize that if he made a mistake he would be placing the prisoners in his care in grave danger." *Id.* at *15.

Similarly, in *Newman*, the defendant officer was responsible for opening and closing the doors in inmate Johnson's cell block. *Newman, supra* at 651. Inmate Johnson was in isolated confinement charged with violating prison rules and, per prison policy, was not allowed out of his cell without an escort because he was presumptively dangerous to others. *Id.* The jury found that the defendant officer opened inmate Johnson's cell door, which caused an "unanticipated" attack on two plaintiff-inmates. *Id.* at 651-652. The *Newman* court, also relying on *Farmer, supra,* found that the defendant officer knew inmate Johnson posed an excessive risk of harm because per prison regulations inmates in isolated confinement were presumptively dangerous to other inmates. *Id.* at 652. Further, the *Newman* court upheld the jury's conclusion that the defendant officer was deliberately indifferent

when he opened the cell door, even though it was unclear under the facts what, exactly, the defendant's subjective intent was. *Id.*

Here, as in *Street* and the additional factually similar cases, Defendant Hurren was quite aware of the threat posed by Townsend. Townsend was well-known for his violence and discipline issues even in Sanilac County and certainly among MCJ staff, including Defendant himself. **(Ex. C, pp. 17-18; Exs. L-M; Exs. P-T; Exs. V-X; Exs. Z- AA).** Townsend also had been put in disciplinary segregation in F-Pod because of his behavior from March 26, 2015 to August 10, 2015 with no discernable effect. **(Exs. L-M; Exs. P-T; Exs. V-X; Exs. Z-AA).** Once placed in E-Pod, Townsend had to be instructed repeatedly to leave the second floor where he was constantly threatening Mr. Selley and inmate Kuch. **(Ex. B, pp. 80, 91, 137, 144; Ex. D, pp. 21, 49; Ex. Y, pp. 41-43, 45-47; Ex. AA).** Mr. Selley did in fact file a grievance regarding Townsend and reported Townsend's threats to officers, as per inmate Kuch's deposition testimony. **(Ex D, pp. 18, 22-23, 25, 27, 37-38).** Townsend was identified for higher security for the remainder of his stay before the subject incident because of the dangers he posed to the staff, himself, and other inmates. **(Ex. Q).** E-Pod policy required that one tier remain on lockdown while the other tier is open. **(Ex. U, p. 118).** All MCJ officers deposed, except Defendant Hurren, agreed that proper linen exchange procedure required keeping a watch on the inmate whose cell is open, and locking the cell once the exchange is completed.

**(Ex. Y, pp. 20, 37; Ex. ), p. 26; Ex. U, pp. 123-124, 126).** Despite the threat posed by Townsend, Defendant Hurren opened Townsend's cell and walked around E-Pod with deliberate indifference to Townsend for more than two minutes before Townsend walked upstairs to assault Kuch and Mr. Selley. **(Ex. H).** Accordingly, there is clearly a question of fact as to Defendant's subjective knowledge that Townsend presented a substantial risk of harm to Mr. Selley and qualified immunity must be denied.

### C. *MONELL* CLAIM AGAINST DEFENDANT MIDLAND COUNTY

In *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690-691 (1978), the United States Supreme Court held that local governments "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." While a municipality cannot be held liable solely because it employs a tortfeasor, liability can be imposed when an employee adheres to an official policy which causes another's constitutional rights to be violated. As set forth in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986), the United States Supreme Court stated that Congress did not intend for municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. *Id.* at 481. In particular, an act represents "official policy" and liability under § 1983 attaches, where the official "possesses final authority to establish municipal policy with respect to the action ordered." *Id.*

A municipality can be held liable for inadequately training its officers when it "evidences a 'deliberate indifference' to the rights of its inhabitants…such a shortcoming [can] be properly thought of as city 'policy or custom' that is actionable under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). Moreover, a failure to establish a policy and/or train deputies with respect to particular injury-causing conduct rises to the level of deliberate indifference if the alleged constitutional violation was "closely related to" or "actually caused" by such a failure to train. *Id.* at 390-91. A plaintiff may demonstrate a "failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*, 455 F.3d 690, 700-01 (6th Cir. 2006) (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (internal quotation marks omitted)).

The evidence in this case supports that Defendant Midland County inadequately trained its corrections' officers as to documenting inmate transfers, transferring inmates to the proper security cellblock, and complying with the proper security measures in a cellblock as to the timing of inmate release in general population—practically in E-Pod. Specifically, there is a lack of transfer notations by the corrections officers as recognized by Captain Harnois where he testified that "generally whoever is moving them for the most part will try and put a notation there. I'm not saying it always happens, but that goes with some type of notation."

22

**(Ex. DD, Harnois, p. 23).** Notably, and based upon the fact that Townsend was supposed to remain in high security F-Pod (administrative segregation) until at least October of 2015 but for some inexplicable reason had ended up in E-Pod to assault Mr. Selley, clearly evidences the lack of training as to inmate transfers and the proper documentation of same.  Moreover, Defendant Midland County also failed to train its corrections officers as to the proper release of inmates into general population while in E-Pod.  Specifically, Captain Harnois testified that "I don't train them on that…[w]e leave that really up to the individual…each one has a little variance on how they do it." **(Ex. DD, p. 15).**  Accordingly, it is clear that Defendant Midland County's failure to provide proper training related to the transferring of inmates and release of inmates into general population within E-Pod exhibits deliberate indifference, and as such Defendants' Motion must be denied.

**D.    PLAINTIFF'S GROSS NEGLIGENCE CLAIM IS NOT TIME-BARRED & VIABLE**
Defendants erroneously argue that Mr. Selley's state law claim of gross negligence is time-barred by the statute of limitations.  In their Brief, Defendants cite the two-year statute of limitations for claims "charging misconduct or neglect of office by the sheriff or the sheriff's deputies" set forth in MCL §600.5805(9), but fail to cite the correct statute of limitations for the claim of gross negligence.  Defendants further rely upon the distinguishable case of *Mulligan v. Schlachter*, 389 F.2d 231 (6th Cir. 1968) wherein a civil rights action was brought for an allegedly unlawful arrest and search by police officers but with no gross negligence claim.  In

contrast, as to the timeliness of Mr. Selley's gross negligence claim, the proper statute of limitations is three years. MCL §600.5805(2); See also *Searcy v. Cnty. of Oakland*, 735 F. Supp. 2d 759, 765 (E.D. Mich. 2010) ("Under Michigan law, the statute of limitations for...gross negligence is three years"). Accordingly, Mr. Selley's gross negligence claim is timely.

"Gross negligence" is defined as conduct "so reckless as to demonstrate a lack of concern for whether an injury results." MCL 691.1407(8)(a). A claim for gross negligence under Michigan law requires that a plaintiff demonstrate the following elements: (1) knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; and (3) the omission to use such care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another. *People v. McCoy*, 223 Mich. App. 500, 566 (Mich. App. 1997). In addition, a governmental employee is not immune from tort liability for injuries to persons caused by the employee while in the course of employment if the employee's actions amount to gross negligence that is the proximate cause of the injury. *Stanton v. City of Battle Creek*, 237 Mich. App. 366, 374-75, (Mich. Ct. App. 1999). Generally, a determination of whether an individual was grossly negligent is a decision for the finder of fact. *Jackson v. Saginaw Co*, 458 Mich 141, 146; 580 NW2d 870 (1998). Evidence of gross

24

negligence will often exhibit itself in the form of "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Tarlea v. Crabtree*, 263 Mich. App. 80, 90 (2004).

Here, Defendant Hurren's conduct, as set forth more fully in Section II, Subsection (B)(1) above, was so reckless as to constitute gross negligence. Notably, despite knowing that Townsend posed a substantial risk to other officers and inmates based on his interactions with Townsend, Townsend's well documented violent behavior, his maximum security housing, and Mr. Selley and Kuch's complaints, Defendant Hurren opened Townsend's cell and failed to monitor him for more than two minutes before Townsend ultimately attacked Mr. Selley and Kuch.

## IV.   **CONCLUSION:**

In light of the evidence, arguments, and case law set forth herein, Plaintiff respectfully requests that this Honorable Court deny Defendants' Motion for Summary Judgment in its entirety.

Respectfully Submitted,
CHRISTOPHER TRAINOR & ASSOCIATES
/s/Amy J. DeRouin
CHRISTOPHER J. TRAINOR (P42449)
AMY J. DEROUIN (P70514)
Attorneys for Plaintiff
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
Dated: December 14, 2018     amy.derouin@cjtrainor.com
AJD/smw